**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SAMANTHA MAGLAYA, individually and on behalf of S.R., her minor daughter, | ) ) | |
| | ) | Case No. 14-cv-3619 |
| Plaintiffs, | ) ) | |
| | ) | Judge Robert M. Dow, Jr. |
| MICHAEL KUMIGA, MICHAEL MCGLADE, & THE CITY OF CHICAGO, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are partial motions to dismiss by Defendants City of Chicago [34], Officer Michael Kumiga [31], and Officer Michael McGlade [43]. For the reasons set forth below, the City of Chicago's motion [34] is granted in part and denied in part, Officer Kumiga's motion [31] is granted in part and denied in part, and Officer McGlade's motion [43] is denied in full. Plaintiffs may proceed against Defendants on the following counts:

**Against City of Chicago:** Counts I–IV, VI–X, and XIII–XV (vicarious liability only); XVIII (in part, as explained herein); XIX; and XX.

**Against Officer Kumiga:** Counts I, II (in part, as explained herein), III–IV, and VII–XV.

**Against Officer McGlade:** Counts IV, VI, VIII–IX.

## I.     Background[1]

This suit arises from the May 17, 2013 shooting of Max: a 19-week-old, 45-pound dog belonging to Plaintiff Samantha Maglaya. At the time, Ms. Maglaya—who is Hispanic and a recipient of Section 8 Housing assistance—was living with her family in Chicago's Norwood

---

[1] The Court accepts as true the facts alleged in Plaintiffs' amended complaint and makes all reasonable inferences in their favor. See *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

Park neighborhood. Her neighbors included Defendant Michael McGlade, a Chicago Police Officer, and former Defendant Don Kumiga ("Mr. Kumiga"), a retired Chicago Police Officer. Mr. Kumiga's son, Defendant Michael Kumiga ("Officer Kumiga"), also a Chicago Police Officer, either lived with his father at the time or frequently visited him.

Ms. Maglaya alleges that Defendants, discontent with sharing a street with someone of her ethnicity and socioeconomic status, wanted her family out of the neighborhood. That animus allegedly extended to Ms. Maglaya's dog, who, on occasion, ventured outdoors unleashed. Several days before May 17, 2013, Officer Kumiga told Ms. Maglaya's husband, who is also Hispanic, that he would shoot Max if he saw him off his leash again.

On the day in question, Ms. Maglaya had just returned home after picking her children up from school. Ms. Maglaya's five-year-old daughter, S.R., let Max out into their backyard to use the bathroom. Max proceeded to run through an open gate into the front yard; S.R. gave chase. It was then that Officer Kumiga, standing approximately three feet away from Max (and five feet away from S.R.), shot Max eight times. Max died soon after. Plaintiffs contend, and Officer Kumiga does not contest, that he was acting "within the scope of his employment" at the time of the shooting. Officer Kumiga would later claim that he shot Max because the dog was "viciously chasing" his son down the street; Plaintiffs deny that any such child was near their home at the time.

Following the shooting, several unidentified members of the Chicago Police Department arrived on the scene. They ticketed Ms. Maglaya's husband for having Max off-leash and not having dog tags; this ticketing was apparently incorrect as Ms. Maglaya, and not her husband, was Max's owner. The officers proceeded to clean up the scene of the shooting. Ms. Maglaya contends that they did so without following proper police protocol; the officers allegedly did

nothing to record the scene and did not file a report concerning Officer Kumiga's discharge of his weapon. When Ms. Maglaya later went to the police station to file a complaint, officers refused to take her statement.

As the other officers were working to clean the scene, Officer McGlade, who was in uniform, told Ms. Maglaya's neighbor—who was her landlord at the time—that he, Officer Kumiga, and Mr. Kumiga had agreed that Ms. Maglaya and her family should not have the dog and should not be in the neighborhood because of their race and Section 8 Housing status. He further claimed that they had all agreed that they would shoot any unleashed dog they saw in the neighborhood. During the conversation, Officer McGlade allegedly referred to Ms. Maglaya as a "spic" and called Max a "nigger dog."

Ms. Maglaya later brought suit individually and on behalf of S.R. against Officer Kumiga, Officer McGlade, Mr. Kumiga, and the City of Chicago. Plaintiffs alleged twenty wide-ranging counts, invoking both federal and Illinois state law. Specifically, against the three individual defendants, Plaintiffs brought a claim for conspiracy to interfere with their civil rights under 42 U.S.C. § 1985(3) (Count III) and two state law claims for damages resulting from hate crimes against Ms. Maglaya and S.R. (Count IX and Count X). Against Officer Kumiga individually, Plaintiffs brought a claim under 42 U.S.C. § 1983 for illegal seizure (Count I), a claim under 42 U.S.C. § 1983 for deprivation of substantive due process (Count II), a claim under 42 U.S.C. § 1986 for failure to prevent conspiracy (Count IV), a state law claim for aggravated cruelty to animals (Claim VII), a claim for intentional infliction of emotional distress upon S.R. (Count X), a claim for negligent infliction of emotional distress upon S.R. (Count XI), a claim for negligent infliction of emotional distress upon Ms. Maglaya (Count XII), a claim for willful and wanton misconduct (Count XIII), a claim for gross negligence (Count XIV), a claim

for conversion of personal property (Count XV), and a claim for trespass to personal property (Count XVI). Plaintiffs also brought 42 U.S.C. § 1986 failure to prevent conspiracy claims against Mr. Kumiga and Officer McGlade individually (Counts V and VI, respectively). Against the City of Chicago, Plaintiffs brought two *Monell* claims (Counts XVII and XVIII), an indemnification claim (Count XIX), and a *respondeat superior* claim (Count XX). Plaintiffs also seek to hold the City of Chicago vicariously liable for the conduct alleged in Counts I–IV, VI–X, and XIII–XVI.

Mr. Kumiga has since been dismissed as a Defendant pursuant to settlement. The remaining three Defendants have filed partial motions to dismiss. The City has moved to dismiss the two *Monell* claims (Counts XVII and XVIII). Officer Kumiga has moved to dismiss the substantive due process claim (Count II), the four state-law tort claims (Counts XI–XIV), and *either* the conversion claim or the trespass to personal property claim (Counts XV and XVI, respectively). Officer McGlade has moved to dismiss all four claims against him, including the § 1985(3) conspiracy claim (Count III), the § 1986 failure to prevent conspiracy claim (Count VI), and the two hate crime claims (Counts VIII and IX).

## II.   **Legal Standard**

In reviewing the sufficiency of a complaint, a district court must accept all well-plead facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Federal Rules of Civil Procedure require only that a complaint provide the defendant with "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id.*

## III. Analysis

### A. City of Chicago's Motion to Dismiss *Monell* Claims

In Counts XVII and XVIII, Plaintiffs seek to hold the City of Chicago—a municipality— liable under 42 U.S.C. § 1983 for violating their Fourteenth Amendment equal protection rights and their right to be free from illegal seizures under the Fourth Amendment. Defendant City of Chicago seeks to dismiss both claims.

Under 42 U.S.C. § 1983, a person may sue anyone who, while acting under color of law, causes him to be deprived of any of his constitutional rights. 42 U.S.C. § 1983; *Connick v. Thompson*, 131 S. Ct. 1350, 1358–59 (2011). A municipality can be held liable under § 1983 only "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy," causes the constitutional deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 536 U.S. 658, 694 (1978). A municipality cannot be held liable solely on a *respondeat superior* basis. *Id.* at 691. The Seventh Circuit recognizes three paths to municipal liability: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (quoting *McTigue v. City of Chicago*,

60 F.3d 381, 382 (7th Cir. 1995)). Here, Plaintiffs rely exclusively on the widespread-custom prong in making their two *Monell* claims.

Consistent with the post-*Iqbal* pleading standard,[2] the Seventh Circuit has held that to state a *Monell* claim a plaintiff must plead "factual content that allows the court to draw the reasonable inference" that the municipality maintained a policy or custom that caused the alleged constitutional deprivation. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Mere "legal conclusions or elements of the cause of action" must be disregarded. *Id.* at 617. Thus, "boilerplate" statements that repeat the elements of a *Monell* claim without any further factual content have been dismissed for failure to state a claim. See, *e.g.*, *Falk v. Perez*, 973 F. Supp. 2d 850, 864 (N.D. Ill. 2013) ("[B]y alleging 'widespread practices,' 'customs,' and 'unofficial policies,' Plaintiff merely states boilerplate legal conclusions that are the elements of her *Monell* claim."); *Annan v. Vill. of Romeoville*, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013) (holding that an allegation that defendant "maintains a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such" was insufficient to state a *Monell* claim); *Sheppard v. Vill. of Glendale Heights*, 2011 WL 6102012, at *4 (N.D. Ill. Dec. 5, 2011) (holding that an allegation that plaintiff was discriminated against on the basis of her sex and race "pursuant to wide-spread practice" of the defendant village was insufficient to state a *Monell* claim).

In order to prevail on a *Monell* claim, a plaintiff also must be able to show that the municipality's policy was the "moving force" behind the alleged injury; that is, a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal

---

[2] It is generally understood that *Monell* claims are not subject to a heightened pleading standard. See *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Estate of Sims ex rel Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (noting that "a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements" with respect to *Monell* claims).

rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); see also *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). The Court reviews each *Monell* claim under this standard.

### 1.    Count XVII: Equal Protection *Monell* Claim

Under a heading titled "Equal Protection Monell Claim" (Count XVII), Plaintiffs first allege that the City maintains a widespread practice of concealing officer misconduct, as evidenced by the City's failure to investigate allegations of misconduct, its failure to maintain accurate and complete records of alleged officer misconduct, its failure to accept complaints from citizens against police officers, its failure to promptly record witness statements or preserve evidence, its failure to discipline officers, its fabrication of exculpatory evidence, its destruction of evidence, etc. Within this same *Monell* claim, Plaintiffs assert several additional widespread practices that allegedly caused the deprivation of their Fourteenth Amendment rights: a practice of failing to maintain accurate and complete records of complaints and investigations; a practice of hiring and firing unqualified officers and failing to properly train, monitor, or supervise its police officers (that's really two practices); and a practice of adhering to a "code of silence," whereby police officers refuse to report instances of misconduct by other officers. Plaintiffs allege that these practices, individually and collectively, create a culture amongst Chicago police officers whereby they believe that they can engage in misconduct without fear of consequence.

To state a *Monell* claim against the City for a violation of Plaintiffs' equal protection rights, Plaintiffs must "'plead[] factual content that allows the court to draw the reasonable inference' that the City maintained a policy, custom, or practice of intentional discrimination against a class of persons to which [Plaintiffs'] belong[]." *McCauley*, 671 F.3d 611, 616 (quoting *Iqbal*, 129 S. Ct. at 1949). In Count XVII, Plaintiffs make no mention of any municipal action

targeted against any specific class of persons. In their response brief, Plaintiffs attempt to fill that gap by arguing that the City's practices at issue here are "aimed at certain racial and ethnic groups." [46, at 4.] More specifically, Plaintiffs claim that "Officer Kumiga and Officer McGlade acted according to racial prejudice and animus." [*Id.*] There are several problems here. First, these equal protection allegations are not part of Plaintiffs' equal protection claim (*i.e.*, Plaintiffs allege that the City fails to address police misconduct *generally*, not police misconduct as it relates to any particular class). Second, even if these facts were included in Plaintiffs' equal protection claim, they do not support a widespread-practice allegation; to the contrary, these facts align with the main thrust of Plaintiffs' complaint, which is that the moving force behind Plaintiffs' equal protection violation was the racial prejudice and animus *of the Defendant officers*.

Importantly, "[t]he required level of factual specificity [for pleading a *Monell* claim] rises with the complexity of the claim." *McCauley*, 671 F.3d at 616–17; *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("A more complex case * * * will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected."). Here, Plaintiffs' *Monell* claim is far along on the complexity scale, composed of at least five separate widespread practices alleging wholesale corruption of the entire Chicago police force. But Plaintiffs fail to provide any factual support linking those practices to the wrongdoing here. The bulk of the "facts" are just conclusory statements—catch phrases exhumed from other successful *Monell* cases, strung together in a kitchen-sink pleading approach—that have become all too common in *Monell* claims raised in non-*pro-se* § 1983 cases. And the only two facts that actually relate to this incident (*i.e.*, that the officers gave Plaintiffs a citation as a means of intimidating them and that the officers refused to

take Ms. Maglaya's statement after the incident) describe Plaintiffs' interactions with the Defendant officers *after* the alleged constitutional harms occurred, and thus are poor candidates establishing that the City's practices were the "moving force" behind Plaintiffs' alleged constitutional harm.

Plaintiffs' allegations qualify as boilerplate, and lack the necessary factual underpinning to justify further investigation. *Strauss v. City of Chicago*, 760 F.2d 765, 768 (7th Cir. 1985) (holding that allowing a plaintiff to proceed to discovery with a boilerplate *Monell* claim "would be tantamount to allowing suit to be filed on a *respondeat superior* basis" such that "[p]laintiffs could file claims whenever a police officer abused them, add *Monell* boilerplate allegations, and proceed to discovery in the hope of turning up some evidence to support the 'claims' made"). Plaintiffs' allegations also lack any causal link establishing that any of the five alleged widespread practices were the moving force behind their alleged constitutional harms—an allegation that is belied by Plaintiffs' complaint and their response brief, both of which identify Defendant officers' conspiratorial animus towards Plaintiffs' ethnic and socioeconomic status as the moving force behind Plaintiffs' harms. Accordingly, Count XVII of Plaintiffs' first amended complaint must be dismissed.

### 2. Count XVIII: Fourth Amendment *Monell* Claim

In their second *Monell* claim against the City of Chicago, Plaintiffs allege that the City violated their Fourth Amendment rights by maintaining de facto policies of (1) improperly training police officers, (2) neglecting to punish officers who violate the Constitution, and (3) covering up for police officers who have unlawfully used their position to harm others. (As a reminder, Plaintiffs' Fourth Amendment claim appears in Count I, where they claim that Officer Kumiga violated their Fourth Amendment rights by illegally seizing their dog.)

Plaintiffs' claim of improper police training is a factually-unsupported, boilerplate allegation that cannot survive a motion to dismiss. See *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *Kowalski v. Cnty. of DuPage*, 2013 WL 4027049, at *2 (N.D. Ill. Aug. 7, 2013) (holding that an otherwise unsupported allegation that defendant municipality had failed to train and supervise its police officers on the appropriate amount of force to use in apprehending suspects was insufficient to state a *Monell* claim); *Hill v. City of Chicago*, 2014 WL 1978407, at *7 (N.D. Ill. May 14, 2014) (dismissing a similar failure-to-train claim); *S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 857–58 (N.D. Ill. 2010) (same). In addition to failing to provide any factual support to sustain this allegation, Plaintiffs also fail to plead how this alleged failure to train officers was the moving force behind Plaintiffs' constitutional harm. This claim is not plausible, and thus must be dismissed.

However, Plaintiffs' claims that the City refuses to discipline officers for engaging in misconduct and that police officers operate under a code of silence, in combination, allow for a plausible inference that these practices emboldened Defendant officers to illegally seize Plaintiffs' dog in violation of the Fourth Amendment. A similar claim survived summary judgment in *Obrycka v. City of Chicago*—thanks to the help of multiple testifying experts— wherein the court held that a reasonable jury could conclude that the defendant officer "was acting with impunity and in a manner in which he thought he was impervious to the consequences of his misconduct," and that the officer's phone calls to other officers after the incident in question could reasonably be interpreted as the officer's attempt to "trigger the code of silence * * * to initiate a cover-up of his misconduct." *Obrycka*, 2012 WL 601810, at *9 (N.D. Ill. Feb. 23, 2012); see also *Sledd v. Lindsay*, 102 F.3d 282, 287 (7th Cir. 1996) (reversing the

district court and holding that plaintiffs stated a "code of silence" *Monell* allegation). This case is quite similar, as Plaintiff alleges that Officer Kumiga conspired with the other Defendant officers in a scheme that allowed him to shoot and kill a dog in front of a five-year-old girl, and then justify that act by falsely claiming that the dog was a danger to nearby citizens—a story that the police fortified by issuing a citation to Plaintiffs' family for having the dog off-leash.

Plaintiffs have provided sufficient factual content to allow the Court to draw the reasonable inference that the City maintained a widespread practice of ignoring police misconduct that, along with a "code of silence" amongst its officers, caused Plaintiffs' alleged Fourth Amendment deprivation. Further, Plaintiffs' allegation that the culture of presumed invulnerability amongst officers was the "moving force" behind Officer Kumiga's alleged illegal seizure of Plaintiffs' dog is also a reasonable one. While Plaintiffs eventually will need to establish Officer Kumiga's individual liability for violating their Fourth Amendment rights,[3] their allegations are sufficient to state a *Monell* claim that survives the motion to dismiss stage. Accordingly, Count XVIII of Plaintiffs' first amended complaint is dismissed in part, and Plaintiffs may proceed on a *Monell* claim based on Defendant City of Chicago's alleged intentional failure to investigate and discipline police misconduct (regarding the types of constitutional deprivations alleged in Plaintiffs' first amended complaint), thereby tacitly approving such conduct, and the Chicago Police Department's alleged "code of silence" regarding police misconduct. Plaintiffs are foreclosed from pursing *Monell* liability based on their allegation of improper training of police officers.

---

[3] See, *e.g.*, *Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 967–68 (N.D. Ill. 2008) (allowing a *Monell* claim to proceed based on an allegation that the City "turned a blind eye to the Defendants officers' and detectives' alleged unconstitutional conduct," but staying discovery on the *Monell* claim pending adjudication of the individual officers' liability).

### B. Officer Kumiga's Motion to Dismiss

Plaintiffs' first amended complaint contains 14 separate counts against Defendant Officer Kumiga. Officer Kumiga has moved to dismiss six of those counts: Plaintiffs' substantive due process claim (Count II), negligence claims (Counts XI, XII, and XIV), willful and wanton misconduct claim (Count XIII), and either their conversion or their trespass to personal property claim (Counts XV and XVI, respectively). The Court addresses each claim in turn.

### 1. Count II: Fourteenth Amendment Substantive Due Process

In their Fourteenth Amendment claim (Count II), brought pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Officer Kumiga (1) deprived Plaintiffs of their right to liberty and property by killing their dog, and (2) deprived Plaintiffs of their right to be free from arbitrary intrusions on personal security, both physical and emotional, by shooting their dog in close proximity to S.R., a five-year-old child.

Substantive due process is an "amorphous" concept of "very limited" scope. *Tun v. Whitticker*, 398 F.3d 899, 900–02 (7th Cir. 2002). The Supreme Court has defined two categories of substantive due process claims. One category protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience. *See Chavez v. Martinez*, 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part) ("The Due Process Clause of the Fourteenth Amendment protects individuals against state action that either 'shocks the conscience,' or interferes with [fundamental] rights 'implicit in the concept of ordered liberty'" (citations omitted)). A plaintiff can challenge executive action under both the "fundamental liberty" and "shocks the conscience" standards of the Fourteenth Amendment's substantive due process doctrine. See *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979).

Plaintiffs' first allegation is that Officer Kumiga deprived them of their fundamental right to property by killing their dog. However, the Supreme Court has held that where another Amendment "provides an explicit textual source of constitutional protection against [the alleged] source of physically intrusive government conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Seventh Circuit has recognized that the shooting of a dog by a police officer can constitute a Fourth Amendment illegal-seizure claim. See *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008). And courts within this circuit have held that dog-shooting allegations framed as Fourteenth Amendment deprivation-of-property claims are more properly pled as Fourth Amendment illegal-seizure claims. See *Taylor v. City of Chicago*, 2010 WL 4877797, at *4 (N.D. Ill. Nov. 23, 2010); *Kay v. Cnty. of Cook*, 2006 WL 2509721, at *4 (N.D. Ill. Aug. 29, 2006). Here, Plaintiffs brought a Fourth Amendment claim against Officer Kumiga (Count I) for his alleged unconstitutional seizure of their dog, and Officer Kumiga has not moved to dismiss that claim. As such, to the extent that Plaintiffs' substantive due process claim relates to the taking of their property (*i.e.*, the dog), it is dismissed, and Plaintiffs must pursue this theory of liability under their Fourth Amendment claim.

What remains of the substantive due process claim is Plaintiffs' allegation that Officer Kumiga's "reckless and obvious disregard" for S.R.'s safety when he shot Max within feet of her constituted an "arbitrary intrusion on [Plaintiffs'] personal security both physically and emotionally." [27, at 8–9.] In other words, Plaintiffs argue that their claim invokes both the "fundamental liberty" prong (*i.e.*, the right to be free from arbitrary intrusions to one's physical and emotional security) and the "shocks the conscience" prong (*i.e.*, shooting eight bullets in the

direction of a child, while simultaneously killing the child's dog) of the substantive due process doctrine.

Regarding the "fundamental liberty" prong, to determine whether an allegation triggers substantive due process protections, the Court must first articulate a "careful description" of the interest said to be violated. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 462 (7th Cir. 2007) (citing *Doe v. City of Lafayette*, 377 F.3d 757, 768 (7th Cir. 2004)). The Court must then decide whether that interest is "fundamental"—"that is, whether it is so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). If a fundamental right is at stake, the Court must then determine "whether the government has interfered 'directly' and 'substantially' with the plaintiffs' exercise of that right." *Id.* (citing *Zablocki v. Redhail*, 434 U.S. 374, 386–87 & n.12 (1978)). Finally, if a fundamental right has been impaired, the Court must determine "whether the governmental action can find 'reasonable justification in the service of a legitimate governmental objective,' or if instead it more properly is 'characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

Here, the interest said to be violated is Plaintiffs' right to be free from arbitrary invasions into their physical and emotional safety (a form of personal integrity). The Seventh Circuit has held that incursions on personal security, including those that "result[] in physical and emotional injury to * * * children," are "indisputably breaches of the Due Process Clause." *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979). Plaintiffs allege that Officer Kumiga violated this right directly and substantially "by shooting downwards at Max eight times while S.R. was only feet away, * * * endanger[ing] S.R.'s life and emotionally scar[ing] Plaintiffs in violation of their right to substantive due process." Viewing the allegations in the light most favorable to

Plaintiffs, Officer Kumiga's actions were arbitrary and failed to further any governmental interest, legitimate or otherwise. Thus, under the "fundamental liberty" rubric set forth in *White*, Plaintiffs stated a claim for a violation of S.R.'s right to be free from arbitrary incursions on her personal security, both physical[4] and emotional.

Regarding the "shocks the conscience" inquiry, this brand of substantive due process is concerned with preventing government officials from "abusing their power, or employing it as an instrument of oppression." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Not all governmental conduct is covered, however, as "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)). Conduct that shocks the conscience includes deliberate government action that is "arbitrary" and "unrestrained by the established principles of private right and distributive justice." *Id.* "Deliberate indifference that shocks in one environment may not be so patently egregious in another," and determining the presence of a due process violation requires an appraisal of "the totality of facts in a given case."[5] *Lewis*, 523 U.S. at 850.

---

[4] While Plaintiffs allege, in conclusory fashion, that S.R. incurred physical injury, there are no facts to support that allegation. However, it is plausible that the actions in question manifested in some form of physical harm, and the parties can explore this further in discovery.

[5] At first glance, the "shocks the conscience" inquiry appears similar in nature to the common law tort of intentional infliction of emotional distress ("IIED"). To be sure, the Supreme Court has made clear that substantive due process is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976). But despite claiming that "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault," the Supreme Court also instructed that the standard for liability lies "only at the ends of the tort law's spectrum of culpability," *id.* at 849, which happens to be where the IIED standard lies. See, *e.g.*, *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 981 N.E.2d 1069, 1079 (Ill. App. Ct. 2012) ("[E]xtreme and outrageous behavior [necessary to state an IIED claim] requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage."). Interestingly here, Officer Kumiga has not moved to dismiss Plaintiffs' IIED claim, but has moved to dismiss their "shocks the conscience" substantive due process claim. Regardless, while the concepts may overlap in some respects, the Court is bound to apply the substantive due process standard as articulated by the Supreme Court, separate and apart from any analysis of Plaintiffs' IIED claim.

To add some perspective to the inquiry, "[l]iability for negligently inflicted harm is categorically beneath the constitutional due process threshold," and "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 834; see also *Christensen*, 483 F.3d at 468. "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but 'less than intentional conduct, such as recklessness or 'gross negligence'' * * * is a matter for closer calls." *Lewis*, 523 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 334 n.3 (1986)). In those close-call instances, plaintiffs need not show that it was "the ultimate purpose of the government actors to harm the[m]," but that the defendants acted "with full appreciation of * * * the brutality of their acts." *Id.* at 850 n.9 (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).

A popular outgrowth from the "shocks the conscience" category of liability is the "state-created danger doctrine." According to this theory, "the substantive component of the Due Process Clause imposes upon the state a duty to protect individuals against dangers the state itself creates." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). To be liable under the state-created danger doctrine, (1) the state must create or increase a danger faced by an individual, (2) the state's failure to protect an individual from such a danger must be the proximate cause of the alleged injury, and (3) the state's failure must shock the conscience. *Id.* at 818. Interestingly, the Seventh Circuit has referred to its decision in *White v. Rochford* as a state-created danger case, see *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015), even though the *White* court didn't expressly require the additional factors in articulating its standard for "shocks the conscience" liability. *White*, 592 F.2d at 383–84.

Regardless, Plaintiffs easily state a claim under the first two elements of the test, alleging that (1) Officer Kumiga created a danger to S.R. by firing eight bullets in her direction from close proximity and killing her dog in the process, and (2) Officer Kumiga's actions were the proximate cause of S.R.'s physical and emotional injury.

Turning to the "shocks the conscience" element, the Court concludes that Plaintiffs have adequately alleged the conscience-shocking nature of Officer Kumiga's actions. Viewing the facts in the light most favorable to Plaintiffs, Officer Kumiga used the "power that comes with a badge" to further his conspiracy to force the Maglaya family out of the neighborhood by shooting a non-threatening dog eight times in close proximity to a five-year-old girl, all without any legitimate governmental purpose. While Officer Kumiga will likely tell a different story— one of exigency and the need to protect children from a violent animal—at this stage of the case, Plaintiffs' allegations detail an abuse of governmental power that rises to the conscience-shocking level. Granted, Plaintiffs allege that Officer Kumiga's actions were *reckless*, not intentional, making this one of the "close call" cases described in *Lewis*. But considering the totality of the circumstances, Officer Kumiga's actions were part of his larger *intentional* conspiracy against the Maglaya family, such that his shooting of the dog was done with full appreciation of the brutality of that act. Plaintiffs have stated a shocks-the-conscience substantive due process claim.

Plaintiffs have sufficiently alleged a deprivation of rights secured by the Constitution to state a claim under § 1983 pursuant to both the "fundamental liberty" and "shocks the conscience" categories (including the state-created danger sub-category) of substantive due process claims, and may proceed to discovery on their Fourteenth Amendment claim

accordingly. Plaintiffs are foreclosed from pursuing a substantive due process claim based on the alleged seizure of property, which Plaintiffs must pursue through their Fourth Amendment claim.

### 2. Counts XI, XII, and XIV: Negligence Claims

Defendant Officer Kumiga argues that Plaintiffs' three negligence-based claims—negligent infliction of emotional distress against S.R. (Count XI), negligent infliction of emotional distress against Ms. Maglaya (Count XII), and gross negligence (Count XIV)—must be dismissed because he is immune from liability for such claims under the Illinois Local Governmental and Governmental Employees Tort Immunity Act. Section 2-202 of that Act provides that "[a] public employee is not liable for his act or omission *in the execution or enforcement of any law* unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (emphasis added). Officer Kumiga asserts that this law gives him immunity from liability for any non-wanton acts committed within the scope of his employment. He claims that since it is undisputed that he was acting within the scope of his employment at all relevant times, he is immune from Plaintiffs' negligence claims.

Officer Kumiga misconstrues the law. Section 2-202 does not provide immunity whenever a public employee is acting within the scope of his employment; instead, it provides immunity "only where the public employee is negligent while *actually* engaged in the execution or enforcement of a law." *Barnett v. Zion Park Dist.*, 665 N.E.2d 808, 814 (Ill. 1996); see also *Aikens v. Morris*, 583 N.E.2d 487, 493 (Ill. 1991) (rejecting defendant's argument that "the performance of any task while on duty is in enforcement or execution of the law" and holding that "[w]e do not believe * * * that the legislature intended such a result"). Indeed, courts have denied immunity when a public employee was acting within the scope of his employment but was found not to be engaged in the execution or enforcement of a law. See, *e.g.*, *Simpson v. City*

*of Chicago*, 599 N.E.2d 1043, 1044–45 (Ill. App. Ct. 1992) (denying § 2-202 immunity where a police officer struck a child on a bicycle while in the process of responding to a missing person call because the officer was not executing or enforcing the law at the time).

"Ordinarily, the determination of whether an officer was enforcing the law is a question of fact that must be determined by the trier of fact in light of the circumstances in each case," but "a court may, as a matter of law, determine whether officers were enforcing a law when the facts alleged support only one conclusion." *Lacey v. Vill. of Palatine*, 904 N.E.2d 18, 28 (Ill. 2009). It is admittedly difficult to determine from Plaintiffs' complaint exactly what Officer Kumiga was doing when he shot Plaintiffs' dog. While it may later be shown that he was "enforcing the law," there is nothing at this stage that establishes that, as a matter of law, he was doing so.

At this point in the litigation, Officer Kumiga cannot establish that he has immunity under § 2-202 solely on the basis that he was acting within the scope of his employment. As such, his motion to dismiss with respect to Count XI (negligent infliction of emotional distress against S.R.), Count XII (negligent infliction of emotional distress against Ms. Maglaya), and Count XIV (gross negligence) is denied.

### 3. Count XIII: Willful and Wanton Misconduct

In addition to their negligence claims, Plaintiffs have brought a separate claim for willful and wanton misconduct against Officer Kumiga (Count XIII). Officer Kumiga seeks to have this claim dismissed on the grounds that Illinois does not recognize a separate and independent tort of willful and wanton misconduct. The Court agrees. See *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 973 N.E.2d 880, 887 (Ill. 2012) ("There is no separate, independent tort of willful and wanton conduct."); *Krywin v. Chi. Transit Auth.*, 938 N.E.2d 440, 452 (Ill. 2010) (same) (citing *Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994)).

Instead, Illinois courts regard willful and wanton misconduct as "an aggravated form of negligence." *Jane Doe-3*, 973 N.E.2d at 887; *Krywin*, 938 N.E.2d at 452. Plaintiffs are free to plead willful and wanton conduct in connection with a negligence claim, where, in addition to the *prima facie* elements for negligence, a plaintiff must also allege "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Krywin*, 938 N.E.2d at 452. The purpose of doing so is usually to make available the option of punitive damages, which are not available for a common negligence claim. See, *e.g.*, *Loitz v. Remington Arms Co., Inc.*, 563 N.E.2d 397, 402 (Ill. 1990) ("'It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" (quoting *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978))). To state a cause of action for negligence under Illinois law, "a complaint must allege sufficient facts to establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of the duty, and an injury proximately caused by the breach." *Regions Bank v. Joyce Meyer Ministries, Inc.*, 15 N.E.3d 545, 549 (Ill. App. Ct. 2014).

Although Plaintiffs' labeled Count XIII as a "willful and wanton misconduct" claim, upon further review, Plaintiffs actually articulated a *prima facie* claim of negligence along with allegations of an aggravated form of negligence.[6] Incidentally, although Defendants do not argue it, "Illinois does not recognize gross negligence as an independent ground for recovery" either. But again, even though Plaintiffs' labeled Count XIV as a "gross negligence" claim, the core allegation there also includes the *prima facie* elements of a negligence claim coupled with the

---

[6] Plaintiffs allege that Officer Kumiga had "a sworn duty to uphold the law and to employ a reasonable amount of care and skill in his actions as a municipal police officer," and that he breached that duty by shooting Plaintiffs' dog in close proximity to S.R., causing damages. [27, at 22.]

allegations of an aggravated form of negligence.[7] Thus, the Court construes Counts XIII and XIV as common negligence claims coupled with allegations of aggravated forms of negligence, and Plaintiffs may proceed on those claims. Officer Kumiga's basis for dismissing Count XIII is therefore unavailing, and his motion must be denied.

### 4. Counts XV and XVI: Conversion and Trespass to Personal Property

Officer Kumiga seeks to have either Plaintiffs' conversion claim (Count XV) or their trespass to personal property claim (Count XVI) dismissed, arguing that they are duplicative.

District courts may dismiss counts in a complaint if they are found to be duplicative. See, e.g., *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 795 (N.D. Ill. 2010); *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 992 (N.D. Ill. 2010). In determining if claims are duplicative, "the relevant inquiry * * * [is] whether the claims are based on the same operative facts and the same injury." *DeGeer*, 707 F. Supp. 2d at 796.

Conversion and trespass to personal property (more traditionally known as "trespass to chattels") are not, at least in the abstract, identical causes of action. To establish a claim for conversion, a plaintiff must show that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.'" *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008) (quoting *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998)). Trespass to chattels involves many of the same elements, although it is committed either by "intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (quoting Restatement

---

[7] Plaintiffs allege that Officer Kumiga had "a sworn duty to uphold the law and to employ a reasonable amount of care and skill in his actions as a municipal police officer," and that he breached that duty by shooting Plaintiffs' dog in close proximity to S.R., causing damages. [27, at 23–24.]

(Second) of Torts, § 217). The difference between the two causes of action "depend[s] on the extent of the alteration" to the chattel. *Loman v. Freeman*, 874 N.E.2d 542, 552 (Ill. App. 4th Dist. 2006), *aff'd*, 890 N.E.2d 446 (Ill. 2008); see also *Luis v. Smith Partners & Assocs., Ltd.*, 2012 WL 5077726, at *6 (N.D. Ill. Oct. 18, 2012) ("The difference * * * is largely a matter of degree."). To state a claim for conversion, the chattel must be "intentionally destroy[ed] * * * or so materially alter[ed] * * * as to change its identity or character." *Loman*, 874 N.E.2d at 552 (quoting Restatement (Second) of Torts, § 216). By contrast, trespass to chattels involves an "interference" with possession of the chattel that is "not sufficiently important to be classified as conversion." *Sotelo*, 384 F. Supp. 2d at 1229–30 (citation omitted).

In this case, Plaintiffs' conversion and trespass claims are based on the same set of "operative facts," namely Officer Kumiga's shooting and killing of their dog. And while the two claims may use different language,[8] they both complain of the same injury: by killing the dog, Officer Kumiga has deprived Plaintiffs of their right to possess the dog. Further, in situations (such as this) where a plaintiff complains of the effective destruction of her property, a conversion claim and a trespass to chattels claim are indistinct. See *Sotelo*, 384 F. Supp. 2d at 1229 ("The court agrees * * * that the two causes of action are distinct in cases * * * where plaintiff does not allege his property is in defendant's possession or has been rendered entirely worthless, but rather that it was interfered with.").

Because the two claims involve the same set of operative facts, allege the same injury, and (due to the extent of injury) are themselves indistinct, they are duplicative. As such, the

---

[8] In Count XV (the conversion claim), Plaintiffs state that Officer Kumiga "exercised a wrongful assumption of dominion over the property of Plaintiffs" and that "[i]n killing the Puppy, Officer Kumiga unlawfully converted it." [27, at 24.] In Count XVI (the trespass to personal property claim), Plaintiffs state that Officer Kumiga "intentionally interfered with Plaintiffs' lawful possession of their personal property, and in its destruction, completely bar[red] Plaintiffs' access to the puppy." [27, at 25.]

trespass to personal property claim (Count XVI) is dismissed, and Plaintiffs may proceed only on their conversion claim (Count XV).

## C. Officer McGlade's Motion to Dismiss

Officer McGlade moves to dismiss all four claims brought against him: the § 1985(3) conspiracy claim (Count III), the § 1986 neglect to prevent conspiracy claim (Count VI), and the two hate crime claims (Counts VIII and IX). For the reasons set forth below, Officer McGlade's motion is denied in full.

### 1. Section 1985(3) Conspiracy Claim

In relevant part, 42 U.S.C. § 1985(3) prohibits two or more persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To establish a § 1985(3) conspiracy claim, a plaintiff must show "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002) (citing *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999)). To establish "purpose" under prong two, Defendants must have acted with "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1970); *Xiong v. Wagner*, 700 F.3d 282, 297 (7th Cir. 2012).

Much like § 1983, § 1985(3) does not create any substantive rights; the two sister statutes act as vehicles for plaintiffs to pursue constitutional violations against certain designated persons or entities. Section 1983, for example, allows a plaintiff to sue a state actor who has deprived the plaintiff of a constitutional right while acting under color of state law. Conversely, "[t]he

function of § 1985(3) is to permit recovery from a private actor who has conspired with state actors." *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) (citing *Dennis v. Sparks*, 449 U.S. 24 (1980)); see also *Turley v. Rednour*, 729 F.3d 645, 649 n.2 (7th Cir. 2013) (same). Thus, in cases where "[a]ll defendants are state actors, * * * a § 1985(3) claim does not add anything except needless complexity." *Id.* (commenting that such claims are "superfluous" to § 1983 claims); *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007) (holding that § 1985(3) "covers conspiracies between public and private actors"). Here, because Mr. Kumiga (a retired police officer) is no longer a party to the case, all remaining Defendants are state actors (*i.e.*, active police officers). Arguably then, there is no need for Plaintiffs to invoke the statute to impose liability on a non-state actor, rendering this claim "superfluous." See *Wilson v. City of Chicago*, 2013 WL 4401364, at *2 (N.D. Ill. Aug. 15, 2013).

The interesting twist here is that Plaintiffs did not sue Defendant McGlade under § 1983; Plaintiffs only alleged the §§ 1985 and 1986 conspiracy-related claims and two state-law hate-crime claims against Officer McGlade. Granted, Plaintiffs did allege that "[t]he acts and omissions of * * * Officer McGlade * * * violate[d] 42 U.S.C. § 1983 because [he was a] state actor[] when taking [the alleged] actions." [27, at 10.] But those allegations are imbedded in Plaintiffs' § 1985(3) conspiracy claim (Count III) and are insufficient to constitute an independent § 1983 claim against Officer McGlade. As such, technically speaking, the § 1985(3) claim isn't superfluous of any other claims against Officer McGlade. Plaintiffs decision to pursue conspiratorial liability against Officer McGlade (and Officer Kumiga, who did not move to dismiss this claim) under the more nuanced (read: complex) § 1985(3) statute—as opposed to a more traditional § 1983 conspiracy—stems from Plaintiffs' now-moot attempt to inculpate private-actor (and former Defendant) Mr. Kumiga into the alleged conspiracy. Regardless,

despite the unnecessary complexity that it may add to the case, Plaintiffs' § 1985(3) claim against state actors is not categorically barred by the language in *Fairley* or its Supreme Court forebears, and thus the Court will proceed to address the merits of Officer McGlade's motion.

In their § 1985(3) conspiracy claim, Plaintiffs allege that Officers Kumiga and McGlade (and former Defendant Mr. Kumiga) conspired to drive them from the neighborhood because of their ethnicity, and that Officer Kumiga's killing of Plaintiffs' dog was an act in furtherance of this conspiracy. Officer McGlade seeks to have this claim dismissed on the ground that the allegation of conspiracy is insufficiently pled.

First, Plaintiffs must allege the existence of a conspiracy. *Green*, 281 F.3d at 665. At the pleading stage, a plaintiff must, at a minimum, allege (1) the parties to the conspiracy, (2) the general purpose of the conspiracy, and (3) the general time at which the conspiracy was formed. See *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). Post-*Iqbal*, a plaintiff must further allege more than "mere suspicion that persons adverse to [him] had joined a conspiracy against him." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009). A plaintiff must show "that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator." *Green*, 281 F.3d at 665 (citing *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999)).

Contrary to Officer McGlade's assertions, Plaintiffs have sufficiently pled a conspiracy. They have alleged the parties to the conspiracy: Officer Kumiga, Mr. Kumiga, and Officer McGlade. They have also alleged the general purpose of the conspiracy: "to kill Plaintiffs' puppy and use this action combined with intimidation and threats of force to compel Plaintiffs to move out of their home and neighborhood because of their race." [27, at 11.] These allegations evince a single plan, known to all conspirators, aimed at injuring Plaintiffs. The time of the conspiracy

is somewhat more problematic, however, as Plaintiffs have not alleged a specific time at which the conspiracy began. However, the time alleged need only be "approximate." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). Given that the alleged conspiracy involved the killing of a 19-week-old puppy, it can be inferred that the conspiracy was formed sometime during the dog's 19-week lifespan. See, *e.g.*, *Bohannon v. City of Milwaukee*, 998 F. Supp. 2d 736, 749 (E.D. Wis. 2014) (allowing inference that a conspiracy was formed at some point between two separate events); *Boothe v. Sherman*, 2014 WL 4362842, at *5 (N.D. Ill. Sept. 3, 2014) (declining to dismiss a conspiracy claim where the conspiracy was allegedly formed sometime within a three-month period). As such, Plaintiffs' allegations are sufficient to ensure that "[D]efendant has notice of what he is charged with." *Hoskins*, 320 F.3d at 764.

Second, Plaintiffs must allege that the conspirators acted with the purpose of depriving a person or class of persons of equal protection of the laws, *Green*, 281 F.3d at 665, which requires a showing that Defendants acted with "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin*, 403 U.S. at 102; see also *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988) (clarifying that "class-based invidiously discriminatory animus" includes "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty"). Plaintiffs rely heavily on two allegations to evince the racial motivations of the alleged conspirators: (1) that very soon after the shooting, Officer McGlade told Plaintiffs' landlord that he, Officer Kumiga, and Mr. Kumiga believed that Plaintiffs did not belong in the neighborhood because of their ethnicity and that the officers had agreed to shoot any unleashed dogs they saw in the neighborhood (including Plaintiffs'), and (2) that Officer McGlade used a series of racial epithets to describe Plaintiffs in his conversation with the landlord. Such allegations are enough at the pleading stage to support a plausible inference that the alleged conspirators acted with

purpose of driving Plaintiffs from the neighborhood because of their ethnicity. See, *e.g.*, *James v. Vill. of Willowbrook*, 2012 WL 3017889, at *10 (N.D. Ill. July 19, 2012) (finding that "the plaintiffs have adequately pleaded that violation of a constitutional right was a goal of the alleged [§ 1985(3)] conspiracy" by alleging that "defendants repeatedly stated that they wished to force the [plaintiffs] to move out of the neighborhood").

Third, Plaintiffs must allege an act done in furtherance of the conspiracy. *Green*, 281 F.3d at 665. The alleged act here is Officer Kumiga's shooting of Plaintiffs' dog. Officer McGlade does not object to this element of Plaintiffs' claim, and thus neither will the Court.

Fourth, Plaintiffs must allege that they suffered an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Green*, 281 F.3d at 665. The alleged injuries here include a deprivation of property (*i.e.*, Plaintiffs' dog) and a deprivation of a right or privilege granted to U.S. citizens (*i.e.*, Fourth and Fourteenth Amendment violations). See, *e.g.*, *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000) (holding that plaintiff stated a conspiracy claim under § 1985(3) where the alleged injuries included Fourth Amendment and Due Process violations, which were actionable harms under § 1985(3) because the conspiracy involved state action (citing *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 830–31 (1983))). But again, Officer McGlade does not object to this element of Plaintiffs' claim, and thus neither will the Court.

Plaintiffs have sufficiently pled a conspiracy under § 1985(3), and thus Defendant McGlade's motion to dismiss Count III of Plaintiffs' first amended complaint must be denied.

### 2.      Section 1986 Neglect to Prevent a Conspiracy Claim

Under 42 U.S.C. § 1986, anyone who—having knowledge of a 42 U.S.C. § 1985 conspiracy and the "power to prevent or aid in preventing" the wrongful acts contemplated by

the conspiracy—"neglects or refuses" to prevent such acts can be held liable to the party injured by the conspiracy. 42 U.S.C. § 1986; see also *Malone v. Am. Friends Serv. Comm.*, 213 F. App'x 490, 494 (7th Cir. 2007); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1233 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). "[A] successful § 1986 claim must be predicated upon a valid § 1985 claim." *Wilson*, 2013 WL 4401364, at *2 (citing *Williams v. St. Joseph Hosp.*, 629 F.2d 448, 451 (7th Cir. 1980)); see also *Grimes v. Smith*, 776 F.2d 1359, 1364 n.4 (7th Cir. 1985) (same). In Counts IV–VI of their first amended complaint, Plaintiffs seek to hold the individual Defendants liable for their failure to prevent their own alleged conspiratorial acts.[9]

Officer McGlade first argues that Plaintiffs' § 1986 claim should be dismissed because there can be no § 1986 liability without a violation of § 1985(3). Because the Court did not dismiss Plaintiffs' § 1985(3) claim on the pleadings, this argument is unavailing.

Officer McGlade next argues that Plaintiffs failed to establish that he had the requisite power to prevent the conspiratorial act (the shooting of Plaintiffs' dog). Officer McGlade relies on *Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011), where the court held that former Mayor Richard M. Daley's "supervisory role, standing alone, [wa]s insufficient" to show that he had the power to prevent particular instances of police torture. *Id.* at 988. The court resolved that "too many variables st[oo]d in the way of a determination that there [wa]s a causal connection between Daley['s] * * * failure to investigate and the deprivation of Plaintiff's rights," making the notion that "the wrongdoing would have stopped once an inquiry was launched * * * simply too tenuous." *Id.* (citations omitted). But here, the "chain of inferences" needed to connect Officer McGlade's failure to act with the alleged wrongdoing is not a tenuous one. Officer

---

[9] Count IV is against Officer Kumiga, who did not seek dismissal of Plaintiffs' § 1986 claim. Count V is against Mr. Kumiga, who is no longer a Defendant. Count VI is against Officer McGlade.

McGlade is alleged to have been a member of the actual three-person conspiracy that devised and executed the alleged wrongdoing; not a distant authority figure to that conspiracy. Plaintiffs' allegations are sufficient.

The Court finds equally unavailing Officer McGlade's contention that he could not have prevented the conspiratorial act because the timing of such act inherently depended on a random event: seeing the dog off its leash. While this may have precluded Officer McGlade from stopping the shooting *in the moment*, it is nonetheless plausible that Officer McGlade could have prevented the shooting at any time between when the agreement was formed and when the dog was shot.

The Court notes that § 1986 is not a distinct cause of action, but is predicated on a finding of § 1985 liability, and allows plaintiffs to extend conspiratorial liability to those outside of the conspiracy that nonetheless had the ability to intervene to stop the wrongdoing. Thus, Plaintiffs' attempt to inculpate Officer McGlade as both a conspirator and one who neglected to prevent his own conspiracy adds—to steal a phrase from the Seventh Circuit—"needless complexity" to the case; the claim is "superfluous." *Fairley*, 578 F.3d at 526. However, Officer McGlade does not object to this duplicative pleading, and thus the Court is inclined to allow Plaintiffs to proceed on both their § 1985(3) and § 1986 claims against Officer McGlade for the time being. Accordingly, Officer McGlade's motion to dismiss Plaintiffs' § 1986 failure-to-prevent-conspiracy claim against him (Count VI) is denied.

### 3.        State Hate Crime Claims

The Illinois Hate Crimes Act is a criminal statute, but it grants a civil right of action for damages to "any person suffering injury to his person or damage to his property as a result of hate crime." 720 ILCS 5/12-7.1(c). A civil plaintiff can bring suit under this provision

"[i]ndependent of any criminal prosecution" for a hate crime. *Id*. "Hate crime" is defined by the statute as being an "assault, battery, aggravated assault, misdemeanor theft, criminal trespass to residence, misdemeanor criminal damage to property, criminal trespass to real property, mob action, disorderly conduct, harassment by telephone, or harassment through electronic communications" committed "by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin" of the victim. 720 ILCS 5/12-7.1(a).

In Counts VIII and IX of their first amended complaint, Plaintiffs accuse Officer Kumiga of misdemeanor criminal damage of their property (*i.e.*, their dog) motivated by Officer Kumiga's racial animus towards Plaintiffs, and they seek to hold Officer McGlade liable as Officer Kumiga's alleged conspirator. Officer McGlade seeks to have this claim dismissed on the ground that he has not committed any of the enumerated offenses that constitute a hate crime, stressing that conspiracy is *not* one of the offenses listed in the statute. The question, then, is whether Plaintiffs can pursue a civil claim against Officer McGlade for conspiring to commit a hate crime.

The plain text of the Illinois Hate Crimes Act provides no insight into this inquiry. The statute does not specify against whom a victim of a hate crime may bring suit to recover damages, and it is silent on conspiratorial liability altogether; it says only that a victim "may bring a civil action for damages, injunction or other appropriate relief." 720 ILCS 5/12-7.1(c).

Regarding applicable case law, neither party has cited to any cases—nor has the Court located any cases—addressing whether an individual alleged to have conspired to commit a hate crime in violation of the Illinois Hate Crimes Act could be sued civilly for damages.

In the criminal context, a defendant cannot be charged with a hate crime if he himself did not commit an offense enumerated in the Illinois Hate Crimes Act. See *People v. Kelly*, 701 N.E.2d 114, 117 (Ill. App. Ct. 1998). However, Illinois's criminal code defines a separate crime of conspiracy, where a person commits conspiracy "when, with intent that an offense be committed, he or she agrees with another to the commission of that offense." 720 ILCS 5/8-2(a). "Offense" in this context is defined in relevant part as any "conduct [that] if performed in this State would be an offense under the laws of this State." 720 ILCS 5/8-6. Because a hate crime as defined in 720 ILCS 5/12-7.1(c) is clearly an "offense under the laws of this State," it qualifies as an "offense" for purposes of Illinois conspiracy law, meaning that one could be charged criminally with conspiracy to commit a hate crime. Similarly, Illinois provides a separate cause of action for civil conspiracy, which requires "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). Because a hate crime is an "unlawful act," it follows that Illinois would support a civil action for conspiring to commit a hate crime.

Officer McGlade's concern, then, lies in the fact that conspiracy in the civil context is a separate cause of action under Illinois law, and Plaintiffs did not plead separate counts distinguishing their hate crime claims from the conspiracy-to-commit hate crime claims. But Plaintiffs are not limited to the labels that they place on the counts in their complaint, nor are they required to plead legal theories explicitly. *Jajeh v. County of Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (plaintiffs stated a hostile-work-environment claim despite never using that phrase in their complaint (citing Fed. R. Civ. P. 8(a)(2))). And Plaintiffs' allegations in Counts VIII and IX

provide ample notice to Defendants of their intent to pursue conspiratorial liability for these claims. [See 27, ¶¶ 101, 108 ("Defendants conspired against and committed acts in furtherance of that conspiracy, shooting and killing the Puppy * * *.").] Indeed, throughout the complaint, Plaintiffs make clear the roles of each officer: Officer Kumiga (the shooter), and Officer McGlade (the conspirator). Accordingly, the Court interprets Counts VIII and IX as alleging Illinois Hate Crimes Act claims against Officer Kumiga, and alleging Illinois common law conspiracy claims against Officer McGlade for his role in conspiring with Officer Kumiga to commit a hate crime.

And as discussed above in the § 1985 context, Plaintiffs have sufficiently alleged a conspiracy by detailing the participants in the conspiracy, their unlawful intentions, the temporal origins of the conspiratorial scheme, and the resulting harm. This information is both sufficient to state a claim for conspiracy under the Illinois common-law standard and to put Officer McGlade on notice of the charges against him in accordance with the notice-pleading standard of the Federal Rules of Civil Procedure. Accordingly, Officer McGlade's motion to dismiss Counts VIII and IX is denied, and Plaintiffs may proceed on those counts as explained herein.

## IV. Conclusion

For the foregoing reasons, the City of Chicago's motion to dismiss [34] is granted in part and denied in part; Officer Kumiga's motion to dismiss [31] is granted in part and denied in part; and Officer McGlade's motion to dismiss [43] is denied in full.

Date: August 3, 2015

_____
Robert M. Dow, Jr.
United States District Judge